IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DAVID DODART, an individual, and YOUNG AGAIN NUTRITION, LLC, a Texas limited liability company, dba YOUNG AGAIN NUTRIENTS, LLC, a Texas limited liability company,<br><br>Plaintiffs and Counterclaim Defendants,<br><br><br>vs.<br><br><br>YOUNG AGAIN PRODUCTS, INC., dba YOUNG AGAIN PRODUCTS INTERNET, INC., a Maryland corporation,<br><br>Defendant and Counterclaim Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW<br><br><br><br><br><br>Case No. 2:03-CV-00035 PGC |

At issue in this trademark infringement and unfair competition action is the ownership of the trademark "Young Again" and use of the uniform resource locator (URL) "youngagain.com," both used in the sale of topical and nutritional supplements. Plaintiffs and counterclaim defendants David Dodart and Young Again Nutrition, LLC (Nutrition) seek a declaratory judgment that they owned and still own the trademark and for related injunctive relief. Nutrition also seeks a declaratory judgment that it can use the URL to market supplements. Defendant and counterclaim plaintiff Young Again Products (Products) seeks a declaratory judgment that it owns the trademark, that Nutrition's use of "Young Again" and the URL "youngagain.com" infringes its trademark, for related injunctive relief, and monetary relief.

On January 23, 24, 25, 26, and 27, 2006, this matter came before the court for a bench trial on liability.  The court reserved a determination of any damages.  Nutrition appeared and was represented by its counsel, Jeremy Hoffman; Mr. Dodart appeared and was represented by his counsel, Michael Kelley; and Products appeared and was represented by its counsel, Mark Freeman, Thomas Freeman, and Samuel Straight.

Following trial, the parties designated deposition excerpts and submitted briefs.  Based upon the evidence presented, the court determines that Products first used the trademark "Young Again" in commerce and Mr. Dodart's use of the mark was and Nutrition's use of the mark is likely to cause confusion.  Additionally, Products did not engage in naked licensing and Nutrition's laches and acquiescence defenses are without merit.  The court therefore concludes that Product's owns and has the exclusive right to use the trademark "Young Again" and that Mr. Dodart and Nutrition infringed the trademark.

## FACTUAL BACKGROUND

Based on the evidence at trial, the factual background surrounding this case is as follows:

I.     **Parties**

   A.     *Young Again Products*

Products has sold various topical and nutritional supplements including, but not limited to, GermanZyme®, Better Cholesterol®, Natural Progesterone Cream, Skin Cure®, Retinol-A, Pregnenolone, Arthritis Free®, Fat Absorb®, The Estrogen Alternative®, The Osteoporosis Answer®, 1% CoQ10, Total Minerals®, DHEA, No-Pain, S.O.D., and Skin Cure.[1]  Products has sold its supplements bearing the "Young Again" mark, both retail and wholesale, through network and cable television, radio, print media, direct mail solicitation, direct sales, credit card

---

[1]Pretrial Order, Undisputed Fact G.

syndication, telemarketing, catalog sales, on-line (Internet) sales, doctors, clinics, and physicians.[2]

Roger Mason is the President of Products. Ivey Mason is the vice president and treasurer of Products and is also the wife of Roger Mason.[3] From October 1993 through 1998, the Masons did business as sole proprietors under the name Young Again Products.[4] On September 1, 1998, the Masons formed the corporation Young Again Products, Inc. in Maryland.[5] In May 1999, Products moved its principal place of business from Maryland to North Carolina.[6] In October 2003, the Masons formed a new company, Young Again Products Internet, Inc., and created Internet websites adopting the URLs "getyoungagain.com" and "youngagainproducts.com" through which it sells its supplements.

B.    *Young Again Nutrition*

Young Again Nutrition, LLC is a Texas limited liability company, doing business as Young Again Nutrients.[7] Nutrition markets and sells topical and nutritional supplements (including Products' supplements) over the Internet via "youngagain.com."[8] Nutrition's

---

[2] Pretrial Order, Undisputed Fact F.

[3] Trial Tr. at 186.

[4] Pretrial Order, Undisputed Fact J.

[5] Pretrial Order, Undisputed Fact J.

[6] Pretrial Order, Undisputed Fact K.

[7] Pretrial Order, Undisputed Fact B.

[8] Trial. Tr. at 41-2; Amend. Compl. ¶6.

customers place their orders directly through the website using Nutrition's electronic product catalog and order system.[9]  Nutrition sells both retail and wholesale.[10]

In 2002, Marcella Ortega organized Nutrition as the successor to a sole proprietorship she had owned and operated since 1996.[11]  Ms. Ortega is the owner and a manager of Nutrition and currently handles the company's financial matters.  She is the mother of Sean Ortega and John Acord a/k/a John Livingston.[12]

Mr. Ortega became involved with "youngagain.com" and Nutrition in 1996 when Mr. Mason asked him to set up a website.  Mr. Ortega organized and managed the business from the time the website opened in late 1996 until his brother Mr. Acord returned from prison in January 1999.[13] Mr. Ortega returned to work for Nutrition in early 2001, and is currently acting as operations manager.[14]

From 1999 to 2003, Mr. Acord served as manager of Nutrition and essentially took over responsibility for running the business.[15]  Mr. Acord is currently Nutrition's marketing manager.[16]

---

[9]Trial Tr. at 41-42, 655-57; Acord Depo. at 69.

[10]Trial Tr. at 608-09.

[11]Acord Depo. at 41.

[12]Trial Tr. at 425.

[13]Trial Tr. at 94-95.

[14]Trial Tr. at 63-64.

[15]Trial Tr. at 571.

[16]Trial Tr. at 570.

C.     *Mr. Dodart*

Mr. Dodart was the President of Life Science Products, Inc. (LSPI), a Utah corporation.[17]
In August 1998, LSPI and Mr. Dodart began selling an anti-aging product named "Young
Again"(the Dodart Product).[18]  Shortly thereafter, Mr. Dodart filed an application with the
United States Patent and Trademark Office (PTO) to register the mark "Young Again" in the
category of vitamins and nutritional supplements (Dodart Trademark Application).  On August
14, 2001, the PTO registered Mr. Dodart's "Young Again" trademark.[19]  Until late 2003 or early
2004, the Dodart Product was marketed through distributors and through an Internet website, but
primarily through a multi-level-marketing network.[20]

## II.     Facts Underlying Products' and Nutrition's Claims

Mr. Mason and Mr. Acord met in 1985 and became good friends.  Mr. Mason is a
self-taught chemist and developer of nutritional supplements, while Mr. Acord is a businessman.
In approximately 1986, Mr. Mason and Mr. Acord first discussed venturing into the nutritional
supplement business.[21]

In June 1993, Mr. Mason began developing a few nutritional supplements.  Mr. Mason,
however, needed money for production costs.[22]  In the summer of 1993, Mr. Acord sent Mr.

---

[17]Pretrial Order, Undisputed Fact A.

[18]Trial Tr. at 384; Ex. P-57.

[19]Ex. P-57.

[20]Trial Tr. at 399, 417-18, 669, 693.

[21]Trial Tr. at 637-38.

[22]Trial Tr. at 263, 272-73, 638-42.

Mason a $4,000 check.  Mr. Ortega provided the funds underlying the check.[23]  Mr. Acord

understood that the funds were provided to assist Mr. Mason with product development costs.[24]

On November 13, 1993, Mr. Acord sent a memo to Mr. Mason accompanied by a

check from Mr. Ortega for $8,310 made payable to Young Again Products.[25]  The memo

indicates that $8,000 was included to fund product development, and $310 was included to cover

the incorporation fee for Young Again Products, Inc.[26] The memo states:

> Your offer of a [one-third] interest is more than generous . . . .  Rather than have
> my interest represented by inventory, I think it better that you have complete
> discretion in the application of funds and I have enclosed a note covering the
> original $4,000 in equity. You can now . . . use the proceeds of sales in whatever
> manner you feel is best; otherwise, you may feel that my total $12,000
> investment[] entitles me to the full $4.00 gross on 6,000 bottles.[27]

At trial, Mr. Acord and Mr. Ortega testified that in return for the checks, they understood at this

time that they were to each receive a one-third interest in a company that was to be formed in

Texas and named "Young Again Products, Inc."[28]

Mr. Mason cashed the checks.[29] Mr. Mason also set aside a check from his own

checkbook, fully intending to use this check to pay the incorporation fee of $310 to form a Texas

corporation named "Young Again Products, Inc."[30]

---

[23]Trial Tr. at 640.

[24]*Id.*

[25]Trial Tr. at 266, 285, 641, Ex. P-1.

[26]Ex. P-1.

[27]*Id.*

[28]Trial Tr. at 272-74.

[29]Trial Tr. at 268, 274; Ex. P-2.

[30]Trial Tr. at 273.

After talking the deal over with this wife on November 13, 1993, however, Mr. Mason decided not to go through with the one-third interest offer.[31]  The Texas corporation referred to in Mr. Acord's 1993 memorandum was never formed.[32]  At trial, Mr. Mason testified that the $8,310 was for 4155 bottles of supplement.[33]  This is consistent with a notation on the check cashed by Mr. Mason.[34]  Conflicting testimony was offered as to whether the money believed to be for the interests was returned to Mr. Ortega or Mr. Acord.[35]  Products produced no proof that the money was repaid to Mr. Ortega or Mr. Acord, although Mr. Mason testified that he unsuccessfully tried to obtain cancelled checks from his bank.[36]

In early 1994, the Masons, Mr. Ortega, and Mr. Acord met in California, where the Masons and Mr. Acord were attending a nutritional supplement trade show.  At this meeting, Mr. Mason thanked Mr. Ortega for providing money for the development of certain products.

From 1993 through 1996, Mr. Mason pursued the supplement business part-time.[37]  The Masons regularly attended trade shows on the east and west coasts to market and sell Products' initial supplements – Young Again ThinAgain, Young Again NoPain, Young Again Retinol-A,

---

[31]Trial. Tr. at 274, R. Mason Depo. at 86.

[32]Trial Tr. at 583.

[33]Trial Tr. at 272.

[34]Ex. P-2; *see also* Trial Tr. at 272.

[35]Trial Tr. at 57, 268-72, 644; R. Mason Depo. at 93-94.

[36]Trial Tr. at 269.

[37]Trial Tr. at 263.

and Young Again Fat Absorb.[38]  In 1994, Products sold No-Pain and Fat-Absorb under the "Young Again" trademark.[39]

Products' 1995 invoices reflect sales of supplements to consumers in Pennsylvania, New York, Michigan, California, Florida, Texas, Ohio, Colorado, Virginia, Maryland, and other states.[40]  All of the supplements in Products 1995 invoices were labeled with the "Young Again" trademark.[41]  By November 1996, Products was receiving $40,000 month from the sale of supplements to consumers nationwide.[42]

In 1996, Mr. Acord proposed selling the supplements Mr. Mason developed via the Internet.[43]  Mr. Mason asked Mr. Ortega to develop a website for this purpose.[44]  Mr. Ortega agreed to do so,[45] and developed the website over a six-month-period during 1996, at his own expense and without compensation.[46]

Other than his prior investment, this was Mr. Ortega's first involvement in the supplement industry.[47]  Mr. Ortega informed Mr. Mason that he intended to use "youngagain.com" as the URL for the website.  Mr. Mason thought it was a good idea.  They

---

[38]Exs. D-302, 304-07.

[39]Trial Tr. at 83.

[40]Trial Tr. at 739; Ex. D-403.

[41]Trial Tr. at 739.

[42]Trial Tr. at 740-41.

[43]Trial. Tr. at 275.

[44]Trial Tr. at 276.

[45]Trial Tr. at 33-34.

[46]*Id.*

[47] Trial Tr. at 82.

both thought it would promote the website and sell Products' supplements.  As part of their

operating agreement, with Nutrition selling and promoting Product's supplements, Nutrition

would use the brand Young Again, and Nutrition would sell Products' supplements.[48]  The

Masons agreed that Mr. Ortega could use the URL "youngagain.com" because they wanted

Products' supplements to be sold on the Internet and wanted Nutrition to sell other products not

supplied by Products, provided that these products would be good, healthy products (not phony

products).[49]  The website was originally named Young Again Products,[50] and Mr.

Ortega registered the URL "youngagain.com" on November 17, 2006.[51]  Ms. Ortega registered

the assumed business name "Young Again Products" in Texas on July 28, 1997.[52]

While Mr. Ortega developed the technical aspects of the website, all website content,

initial products, product descriptions, and advertising information came from Mr. Mason.[53]

All the initial products were labeled with the "Young Again" brand at the top center.[54]  Nutrition

added three other products from other vendors[55] but Mr. Mason approved of the products.[56]

At trial, Mr. Acord and Mr. Ortega testified that at the time "youngagain.com" was created,

they still believed that they each had a one-third interest in a venture with Mr. Mason.  The first

---

[48]Trial Tr. at 92-93

[49]Trial Tr. at 209; 228-29.

[50]Trial Tr. at 42.

[51]Ex. P-3.

[52]Trial Tr. at 43; Ex. P-4.

[53]Trial Tr. at 276.

[54]Trial Tr. at 101-02.

[55]Trial Tr. at 45-46, 51, 287-88.

[56]Trial Tr. at 130, 232-33, 495-61.

indication they had that Mr. Mason did not agree to such a venture occurred in late 1997.[57]

By late 1997, Nutrition owed Products $800 for supplements.[58]  When Mr. Mason raised the issue with Mr. Ortega, Mr. Ortega stated that he believed he had vested interest in Mr. Mason's company.[59]  Mr. Mason told Mr. Ortega that neither he nor Mr. Acord had an interest in the company.[60]

In December 1997, Mr. Mason demanded that Nutrition cease selling Fat Absorb on "youngagain.com" under the Young Again Products name because of an exclusive license with another distributor.[61]  Mr. Ortega was upset as Fat Absorb was one of Nutrition's best selling products.[62]  Products, however, approved the use of a substitute product, Fat Sponge, provided that Mr. Ortega change the name that appeared on the website pages from Young Again Products to Young Again Nutrients.[63]  Mr. Ortega responded by replacing Fat Absorb with Fat Sponge. Mr. Mason helped Mr. Ortega put the Fat Sponge product together.[64]  Mr. Mason provided the actual information for the product label and recommended the manufacturer (Nittany).[65]

---

[57]Trial Tr. at 55-56.

[58]Trial Tr. at 55.

[59]Trial Tr. at 56.

[60]*Id.*

[61]Trial Tr. at 52.

[62]*Id.*

[63]Trial Tr. at 130-32.

[64]Trial Tr. at 109, *see also* Trial Tr. at 194-95.

[65]Trial Tr. at 115.

By the latter part of 1997, however, Mr. Ortega had yet to change the name on the pages of the website and had not paid Products.[66]  In response, Mr. Mason set conditions to be met before Nutrition and Products could continue doing business, including paying for supplements in advance plus 10% to pay-off the past-due debt, changing the name on the pages of the website, and sending proof that the website was no longer registered to Young Again Products.[67] Until January 1998, Nutrition's product order form, website, bank account, and business address included the assumed business name "Young Again Products."[68]  Shortly thereafter, however, the Ortegas changed the assumed business name of their enterprise from Young Again Products to Young Again Nutrition to accommodate Mr. Mason's infomercial deal.[69]  Ms. Ortega registered the assumed business name Young Again Nutrition in Texas on January 21, 1998.[70] In a letter dated January 1998, however, Mr. Ortega expressly refused to change the URL "youngagain.com."  He wrote that he owned the URL, would sell whatever products or services Nutrition decided were appropriate on the website, and neither Products nor any other entity exercised control over the website.[71]

On January 21, 1998, Mr. Mason filed an application with the PTO to register the trademark "Young Again Plus" (Young Again Plus Trademark Application) for the following

_____

[66]Exhibit P-58.

[67]Ex. P-58.

[68]Trial Tr. at 47-48, 162-64; Exs. P-5 to -11.

[69]Ex. P-12.

[70]Trial Tr. at 57-58, 61-62, 282-85; Exs. P-12 to -13.

[71]Trial Tr. at 57-60; Ex. P-12.

goods and services: Manufacture /Distribute Natural Health and Beauty Aids.[72]  Although

Mr. Acord and Mr. Ortega recognized that "Young Again" was Products' trademark[73] and that

Products permitted them to use the same,[74] the Masons consistently identified

"youngagain.com," as Nutrition's.[75]  Mr. Mason did not know how or if he could legally make

Nutrition change the URL.[76]  So in response to Mr. Ortega's 1998 letter, Products ceased all

sales of products to Nutrition.[77]  As most of the products offered via "youngagain.com" came

from Products, Products believed this would be effective and the Masons were not worried about

Nutrition ruining the name "Young Again."[78]  The website's sales were de-minimus in 1998.[79]

Additionally, Mr. Acord, who was in prison, asked Products not to take down the website, and

promised to take it over as soon as he was released in a matter of months.[80]  Mr. Acord told Mr.

Ortega that he would work things out between Products and Nutrition when he was released.[81]

    In 1999, when Mr. Acord was released from prison, Mr. Ortega turned management of

the website over to him.[82]  Shortly after his release, Mr. Acord wrote the Masons, "I need your

---

[72]Ex. P-38.

[73]Ex. D-190, 201.

[74]Ex. D-19.

[75]Exs. P-16, 17, 22, 29, 46-47.

[76]Trial Tr. at 277, 280-81; R. Mason Depo.at 127.

[77]Trial Tr. at 197, 232-33.

[78]Trial Tr. at 219-20, 341-42.

[79]Trial Tr. at 735-37; Exs. D-15, 446, 403A.

[80]Trial Tr. at 219-20, 341-42.

[81]Trial Tr. at 153-54.

[82]Trial Tr. at 63.

guidance as I do not want to make any false steps or compromise our relationship, so I'm going

to ask a lot of questions until I have the SOP [Standard Operating Procedure] understood.

Before putting anything on the page, I want you to read it over for accuracy and suitability."[83]

The letter also included an order for supplements, to which Products immediately responded by

making its first shipment to Nutrition in over a year.[84]

      Between 1999 and 2002, business relations between Products and Nutrition were

generally good.[85]  When Mr. Acord took over, Nutrition had not introduced new products from

other manufacturers, and the product line remained largely unchanged.[86] Mr. Acord began

adding products, including products that Products developed.[87]  In 1999, Products decided to

discontinue offering Retinol-A and No-Pain,[88] and "gave" the same to Nutrition.  Mr. Mason

sent Nutrition a fax on February 21, 1999, giving detailed instructions for the production of

Retinol-A, including the contract packager (EMS), necessary ingredients and amounts, order

quantities, jar sizes, and contact information.[89]  Over eight months later, in November 1999, Mr.

Mason again sent Nutrition a fax with detailed instructions including information on the type of

Vitamin A to order, the raw material provider to use, cost, and pricing.[90]  After Nutrition

assumed No Pain and Retinol-A, Products continued to obtain samples of these supplements:

---

[83]Ex. D-15.

[84]Exs. D-15,  D-403A no. 1371.

[85]Trial Tr. at 155.

[86]Exs. D-237; P-11.

[87]Trial Tr. at 658-59.

[88]Trial Tr. at 309.

[89]Ex. D-78, Trial Tr. at 57-58.

[90]Ex. D-84, Trial Tr. at 358.

Retinol-A samples for use in making exotic creams and No-Pain for family members.[91]  In May

2000, Products was still providing instructions to Nutrition with respect to Retinol-A.[92]

Until early 2003, communications between Mr. Mason, Mr. Acord, and manufacturers

indicate that Mr. Mason provided labeling information and advertising,[93] formulas (including

ingredients, strength, unit count, and costs),[94] suggestions,[95] pricing,[96] dosages,[97] and

ingredients[98] for particular supplements.  Based on Mr Mason's recommendation, Nutrition used

the same supplement manufacturer (RASI Laboratories) that Mr. Mason used for Product's

supplements.[99]  Mr. Acord openly acknowledged to a customer as late as May 2003, that Mr.

Mason is "watching over" at least one of the supplements.[100]

At some point, however, Nutrition had Alan Burns manufacture the Retinol-A product.[101]

Mr. Mason strongly disliked Mr. Burns and claimed that Mr. Burns was stupid and

---

[91]Trial Tr. at 359-60.

[92]Ex. D-87.

[93]Trial Tr. at 498.

[94]Trial Tr. at 500-01; Ex. D-79.

[95]Ex. D-80.

[96]Ex. D-85.

[97]Ex. D-89, 91.

[98]Trial Tr. at 507; Ex. D-101.

[99]Trial Tr. 442-43, 500, 716-17.

[100]Ex. D-41.

[101]Trial Tr. at 309, 689.

incompetent.[102]  Mr. Acord also changed the formula for the product.[103]  Since 1999, Nutrition

has used its own labels for Retinol A and No-Pain,[104] which identify Nutrition as the source of

the supplement with the "Young Again" trademark at the top of the label.[105]

        Additionally, shortly after Mr. Acord came on board, Nutrition began adding

supplements from other suppliers,[106] including Nicoban in 2000,[107] Joint Factors in 2000,[108] and

Carbosmasher in 2001.[109]  Each were labeled "Young Again Nutrition."[110]  Mr. Mason insisted

that Nutrition removed these supplements from "youngagain.com."[111]  Nutrition refused, and

continued to sell (and still sells) these supplements.[112]  Mr. Mason also chastised Mr. Acord for

selling 100 mg. B-6 tablets, wrinkle pills, and Feminine Forever.[113]

        When Mr. Mason would object that particular supplements did not fit in and ask Mr.

Acord to remove them from the website, Mr. Acord said he would remove them from the

---

[102]Trial Tr. at 689.

[103]Trial Tr. at 691.

[104]Trial Tr. at 115.

[105]Trial Tr. at 308; Exs. D-154, P-19, 32; I. Mason Depo. at 33, 114.

[106]Trial Tr. at 660-61.

[107]Trial Tr. at 661.

[108]Trial Tr. at 662.

[109]Id.

[110]Trial Tr. 663.

[111]Trial Tr. 290-92.

[112]Trial Tr. at 65-67, 290-92, 554-55, 609, 614, 660-68; Exs. P.-31, 34-35.

[113]Ex. P-17.

website or would sell what stock he had and remove them.[114]  Despite Mr. Mason's complaints,

Mr. Acord never removed the products from "youngagain.com."[115]

       Serious problems arose in late 2002 or early 2003 when Nutrition began placing a large

number of supplements on the website without Products' approval and continued to sell those

products despite Product's repeated objections.[116]  By 2002, Nutrition offered approximately

150 to 200 supplements,[117] 15 from Products.[118]  By mid-2003 Nutrition was selling at least 200

supplements Nutrition was not obtaining from Products.[119]

       Commenting on Nutrition's 2002 price list, Mr. Mason provided Nutrition with a list of

objections about the supplements offered on "youngagain.com."  In the Fall of 2002, Products

learned that Nutrition was adding supplements on the website that contained the ingredients that

Mr. Mason's books and articles (also on the website) described as unproven and worthless –

Joint Factors (a chondroitin product)[120] and Lyco-prostate.[121]  In a November 17, 2002 e-mail,

Mr. Mason informed Mr. Acord that Nutrition's addition of such supplements was "ruining the

entire program we're doing" and customers "can't figure out what I'm doing telling them not to

take this crap."  Mr. Mason told Mr. Acord, "you cannot sell chondroitin, lycopene, noni juice,

deer antler velvet or any of that other crap" and demanded that the chondroitin product be

---

[114]Trial Tr. at 338-39.

[115]Trial Tr at 610-12, 670, 695-96.

[116]Trial Tr. at 155, 217-19.

[117]Trial Tr. at 70; Batts Depo. at 22.

[118]Trial Tr. at 292.

[119]Trial Tr. at 695-96.

[120]Trial Tr. at 613-14.

[121]Ex. D-273.

removed from the website.[122] Nutrition did not remove a single product from its website in response to Mr. Mason's criticisms.[123]

In early 2003, Mr. Acord told Mr. Mason that Nutrition was going to adopt the National Nutritional Foods Association standard for Nutrition's labels.  Despite Mr. Mason's objection, Nutrition adopted the standards.[124]

Mr. Mason also reviewed Nutrition's Spring 2003 price list[125] and prepared a type-written list for Nutrition with comments on every supplement.[126]  In response, Mr. Acord assured Mr. Mason that he would delete some of the supplements when the remaining stock was depleted. Mr. Acord explained, however, that other supplements, such as chondroitin, were on the list as a "marketing gimmick"[127] and he refused to remove them.  Nutrition's refusal to remove such supplements plus the fact that Nutrition owed Products $120,000 for supplements were the proverbial straws that broke the camel's back.[128]

In later years of the relationship, (late 2002, early 2003) labels on some of the supplements (Products' supplements and supplements Products developed and/or approved) sold via "youngagain.com" have the trademark "Young Again" and state that "Young Again" is the

---

[122]Ex. D-118.

[123]Trial Tr. 666-68; Ex. D-97.

[124]Trial Tr. at 693-94; Exs. P- 48 to -49.

[125]Ex. D-123.

[126]Trial Tr. at 294; Ex. P-31.

[127]Trial Tr. at 664; Ex. D-157.

[128]Trial Tr. at 463-65.

trademark of Products.[129]  They also state that Nutrition distributes the supplements.[130]  In February 2003, Mason requested the phrase "Young Again is a trademark of Young Again Products, Inc." on all product labels.[131]  Jane Batts (Nutrition's office/warehouse manager) or Mr. Acord were supposed to proof and approve labels of supplements Nutrition sold, including those sold identifying Products as the owner of the "Young Again" trademark.[132]

In correspondence between July and August 2003, Products told Nutrition that it could not continue to sell Products' supplements or use the trademark "Young Again."  But Nutrition continued to sell Products' supplements.[133]  In one e-mail, Mr. Mason recognized that Nutrition needed the URL "youngagain.com" to continue to operate.[134]  At trial, however, Mr. Mason testified that the e-mail was a settlement offer (among others made by Nutrition[135]) and that by letting Nutrition use the URL without other references to "Young Again" on the website, Nutrition would no longer be confused with Products.[136]  Because Nutrition did not respond to Products' "efforts to settle," would not pay Products the money it owed, and continued to sell

---

[129]Trial Tr. 235-40, 467-71, 523-24; Ex. D-185, 186, 188, 196-98, 206, 443 nos. 10, 19, 1874, 1875; Acord Depo. at 69, 178, 352-53; Batts Depo. at 83-85, 92-95; *see also* Trial Tr. 598-600; Exs. D-203 to -04, 207, 209, 212, 443 no. 8; Acord Depo. at 101-02; Batts Depo. at 76-78, 83-84, 86-87, 90.

[130]Trial Tr. 235-40, 467, 469-71, 523-24; Ex. D-185, 186, 188, 196-98, 206, 443 nos. 19, 1874, 1875; Acord Depo. at 69, 178, 352-53; Batts Depo. at 83-85, 92-95; *see also* Trial Tr. 598-600; Exs. D-203 to -04, 207, 209, 212, 443 no. 8; Acord Depo. at 101-02; Batts Depo. at 76-78, 83-84, 86-87, 90.

[131]Trial Tr. at 317; Ex. P-18.

[132]Trial Tr. at 715; Batts Depo. at 34.

[133]Trial Tr. at 469; Exs. D-175, 177, P -30.

[134]Ex. P-27.

[135]Exs. P-28 to -29.

[136]Trial Tr. at 352-53.

trademarked products, Products filed a lawsuit in Maryland with regard to its trademarked

product names but not the "Young Again" trademark.[137]  Products also formed two Internet sites

– "getyoungagain.com" and "youngagainproducts.com"– to sell and promote Products'

supplements and the "Young Again" brand.[138]

        As of March 10, 2004, almost eight months after termination of the parties' relationship,

Nutrition continued to advertise and sell supplements on the website under the "Young Again"

brand, and also advertise most of Products' supplement line.[139]  As of March 10, 2004, nine of

Products' supplements were offered for sale on "youngagain.com."[140]  Nutrition also included in

its product offerings at least 16 additional products labeled with the "Young Again" brand.[141]  In

2004 and 2005, Products received e-mails from customers who were confused about the source

of the products they were purchasing, or were inquiring about products purchased or offered on

Nutrition's website.[142]

        In 2004 and 2005, Nutrition averaged significant revenue from its supplement sales and

Products' supplements accounted for significant percentage of its revenues.[143]  Nutrition

spent part of its revenues on marketing and advertising "youngagain.com."[144]

---

[137]Trial Tr. at 354-55.

[138]Trial Tr. at 326-27.

[139]Trial Tr. at 283-39, 590-93, Ex. D-288.

[140]Ex. D-288.

[141]Id.

[142]Exs D-314 to -17, 20-21, 26, 32, 35.

[143]Trial Tr. at 69.

[144]Trial Tr. at 656.

III.        **Facts Underlying Mr. Dodart's and Products' Claims**

Mr. Dodart's first use in commerce of the "Young Again" mark was on August 1, 1998,

on the Dodart Product.[145] The Dodart Product is

> an anti-aging product that is designed to stimulate the release of human growth
> hormone which in turn is designed to restore some youthful qualities that we had
> when we were younger when our body excreted more growth hormone and
> provide more muscle mass, more energy, endurance, quick recovery after
> exercise, for example, a variety of things such as that nature.[146]

The Dodart Product consists of a proprietary blend of amino acids and a proprietary

delivery system.[147]

Sometime before August 28, 1998, when Mr. Dodart filed his application to register the

"Young Again" trademark (the Dodart Trademark Application),[148] Mr. Dodart selected the name

"Young Again" out of numerous names being "kicked around" because he "thought is was

catchy" and because the rest of his staff liked it.  Mr. Dodart speculated that he may have been

stimulated to choose the name by a book written by a Dr. Ronald Klatz titled, "Grow Young

Again with hGH."[149]  At the time Mr. Dodart selected the name "Young Again" for the Dodart

Product, he had not heard of Products or any of Products' supplements.[150]

An August 18, 1998, trademark search performed by Mr. Dodart's trademark

---

[145]Ex. P-57.

[146]Trial Tr. at 384.

[147]Trial Tr. at 401-03.

[148]Ex. P-54.

[149]Trial Tr. at 384-86.

[150]Trial Tr. at 385.

counsel revealed only a pending application by Mr. Mason for the mark "Young Again Plus"

(the Young Again Plus Trademark Application).  That application was for the

"Manufacture/Distribute Natural Health and Beauty Aids" in international class 35 (advertising

and business services).[151]  When Mr. Dodart filed the Dodart Trademark Application on August

28, 1998,[152] he signed a declaration that

> [t]o the best of my knowledge and belief no other person, firm, corporation or association
> has the right to use said mark in commerce, either in identical form or in such near
> resemblance thereto as may be likely, when used on or in connection with the goods of
> such other person, to cause confusion, or to cause mistake, or to deceive.[153]

In a September 18, 1998 action letter, the PTO advised Mr. Mason that "[t]he wording in

the identification of goods [in the Young Again Plus Trademark Application] is too broad

because it could include items and/or services classified in other classes" including international

class 35 and international class 5 (vitamins and nutritional supplements).  The PTO further

advised Mr. Mason that his application was "currently classified in international Class 35 for

distributorship services" and that the application would be deemed abandoned if he did not

respond to the action letter within six months.[154]  The Dodart Trademark Application was

suspended on May 17, 1999, pending disposition of the Young Again Plus Trademark

Application.[155]  Products never responded to the September 18 action letter and abandoned the

---

[151]Ex. P- 40.

[152]Ex. P-54.

[153]*Id.*

[154]Trial Tr. at 330-31; Ex. P-39.

[155]Ex. P- 42.

Young Again Plus Trademark Application,[156] effective June 11, 1999.[157] The Dodart Trademark Application was published for opposition May 23, 2000.[158]  On June 19, 2000, Products applied for registration of the "Young Again" trademark (the Young Again Trademark Application). Products, however, did not oppose the Dodart Trademark Application.[159]

Products sent a cease and desist letter dated June 27, 2000 to LSPI.  Mr. Dodart's counsel responded in a letter dated July 5, 2000.[160]  Mr. Dodart finalized his application for registration of the "Young Again" mark on November 22, 2000, declaring (through his counsel) that he believed himself to be the owner of the "Young Again" trademark.[161]  On May 14, 2001, the Young Again Trademark Application was suspended due to the pending Dodart Trademark Application.  On August 14, 2001, the PTO registered Mr. Dodart's "Young Again" trademark on the Principal Register for vitamins and nutritional supplements.[162]  On November 26, 2001, Products filed a Petition for Cancellation of Mr. Dodart's "Young Again" trademark with the Trademark Trials and Appeals Board (TTAB).  The TTAB stayed the cancellation proceeding pending resolution of this action.

On January 8, 2003, Mr. Dodart began this action by filing a Complaint in this court against Products.  In his Complaint, Mr. Dodart asserted causes of action under federal law for

---

[156]Trial Tr. at 331.

[157]Ex. P-43.

[158]Ex. P-41.

[159]Trial Tr. at 332; Ex. P-44;

[160]Ex. D-6.

[161]Ex. D-8.

[162]Ex. P-57.

trademark infringement, unfair competition, and declaratory judgment and under state law for dilution, unfair practices, and intentional interference with economic relations (the Dodart/Products claims).  Mr. Dodart sought to recover Products' profits, Mr. Dodart's damages, punitive damages, attorney's fees and costs (the Dodart/Products Monetary Claims) and further sought a declaratory judgment to the effect that Mr. Dodart was the owner of the "Young Again" trademark, that Products had no rights in the same or in the "Young Again" name, that Products' cancellation petition before the PTO should be dismissed with prejudice, and for related injunctive relief (the Dodart/Products Equitable Claims).

On March 17, 2003, Products filed a Motion to Dismiss for Lack of Personal Jurisdiction.  On June 5, 2003 this court denied the motion to dismiss.  On June 20, 2003, Products filed its first Answer and Counterclaim.

## IV.        Nutrition Enters this Action

On September 11, 2003, Mr. Dodart executed a litigation agreement whereby he assigned to Nutrition all monetary claims that he possesses in this action against Products.[163]  On September 17, 2003, Mr. Dodart purportedly assigned all right, title, and interest to the registered trademark "Young Again" to Nutrition.[164]  In the litigation agreement, Mr. Dodart specifically indicates that the registered trademark is being assigned together with the goodwill of the business symbolized by the mark, however, "Dodart/LSPI is not transferring, selling or assigning any rights in the Dodart Product to Nutrition, and that the Young Again® trademark assignment may be deemed invalid on that basis . . . ."[165]

---

[163]Ex. D-296.

[164]Exs. D-297, P-55.

[165]Ex. D-296.

On October 1, 2003, Mr. Dodart filed a motion to substitute Nutrition as a party, or to join Nutrition as a party.  On December 4, 2003, this court entered an Order Allowing Joinder of Young Again Nutrition and Denying Motion to Substitute Parties, reasoning that Products pleaded counterclaims against Mr. Dodart and that Products might not be afforded complete relief if Mr. Dodart were dismissed.

On March 4, 2004, Mr. Dodart signed a Product Distribution Agreement transferring Mr. Dodart's and LSPI's rights in the Dodart Product to Nutrition.[166]  The reason for the roughly five-and-one-half-month gap between the trademark assignment and the Product Distribution Agreement is that Mr. Dodart was in negotiations with a third party and it was not settled if Nutrition would be obtaining the Dodart Product from Mr. Dodart, LSPI, or the third party (or potentially even developing Nutrition's own product to sell under the registered trademark).[167] Nutrition purchased Mr. Dodart's remaining inventory of the Dodart Product.[168]  Since 2004, Nutrition has sold the Dodart Product on "youngagain.com."[169]

On October 24, 2004, Nutrition filed its First Amended Complaint against Products.  In its Amended Complaint, Nutrition asserted causes of action against Products for declaratory judgment, deceptive trade practices, and unfair competition (the Nutrition/Products claims).  Nutrition sought: (1) to recover on the Dodart/Products Monetary Claims as the assignee of Mr. Dodart; (2) to recover monetary damages, attorney's fees, costs, prejudgment and post-judgment interest in its own right arising out of Nutrition's ownership of the "Young

---

[166]Ex. P-56.

[167]Trial Tr. at 387, 390.

[168]Trial Tr. at 686-87.

[169]Trial Tr. at 68.

Again" unregistered mark and Nutrition's ownership of the "Young Again" registered trademark since September 17, 2003 (the Nutrition/Products Monetary Claims); (3) a declaratory judgment to the effect that Nutrition was the owner of the "Young Again" unregistered trademark and the registered trademark, that Products had no rights in the unregistered trademark, that the registered trademark was entitled to remain registered on the Principal Register; and (4) for related injunctive relief (the Nutrition/Products Equitable Claims).

On November 19, 2004, Products filed its Answer to Nutrition's First Amended Complaint and Amended Counterclaim, asserting the following claims against Nutrition: (1) false designation of origin under 15 U.S.C. § 1125; (2) common law unfair competition under Maryland law; (3) common law unfair competition under Utah law; (4) violation of Maryland's Unfair or Deceptive Trade Practices Act; (5) violation of Utah's Unfair Practices Act; (6) intentional interference with existing and prospective economic relations; (7) federal dilution of a famous mark under 15 U.S.C. § 1125(c); (8) dilution under state law; and (9) declaratory judgment (the Products/Nutrition claims).  In Products' Counterclaim, Products sought to recover from Nutrition profits, damages, treble damages, statutory damages, punitive damages, attorney's fees, costs and prejudgment interest (the Products/Nutrition Monetary Claims). Products also sought a declaratory judgment to the effect that it was the owner of the "Young Again" trademark and that Nutrition had no rights in the "Young Again" trademark or name and related injunctive relief (the Products/Nutrition Equitable Claims).[170]

In its Amended Counterclaim, Products asserted the following claims against Mr. Dodart: (1) false designation of origin under 15 U.S.C. § 1125; (2) declaratory judgment; (3) common law unfair competition under Maryland law; (4) common law unfair competition under Utah law

---

[170]Pretrial Order at 4-5.

(the Products/Dodart Infringement Claims).  It also asserted claims (5) under Maryland's Unfair

or Deceptive Trade Practices Act; (6) under Utah's Unfair Practices Act; (7) of intentional

interference with existing and prospective economic relations; (8) of federal dilution of a famous

mark under 15 U.S.C. § 1125(c); and (9) of dilution under state law (the Products/Dodart

Miscellaneous Counts).  Products sought to recover from Mr. Dodart profits, damages, treble

damages, statutory damages, punitive damages, attorney's fees, costs and prejudgment interest

(the Products/Dodart Monetary Claims).  It further sought a declaratory judgment to the effect

that Products was the owner of the "Young Again" trademark and that Dodart had no rights in

the "Young Again" trademark, and related injunctive relief (the Products/Dodart Equitable

Claims").[171]

      Products and Mr. Dodart thereafter filed cross-motions for summary judgment.

On June 30, 2005, the court entered an order: (1) Denying Products' Motion

for Partial Summary Judgment; (2) Granting in Part and Denying in Part Mr. Dodart's Motion

for Summary Judgment, and (3) Dismissing Certain Claims as Per Oral Stipulation.  In

particular, the court dismissed with prejudice the Products/Dodart Miscellaneous Counts and the

Products/Dodart Monetary Claims, whether arising out of the Products/Dodart Infringement

Counts, Products/Dodart Miscellaneous Counts, or otherwise, and including, but not limited to,

any claims for any form of monetary relief whatsoever against Dodart arising out of, connected

with or relating to Mr. Dodart's use of the alleged "Young Again" trademark and/or "Young

Again" name and/or arising out of, connected with or relating to Mr. Dodart's sales of the

Dodart Product.[172] As between Nutrition and Products, the Court also dismissed with prejudice

---

[171]Pretrial Order at 5-6.

[172]Pretrial Order at 6.

the Dodart/Products Monetary Claims (which Mr. Dodart had assigned to Nutrition) arising out of the Dodart/Products Counts.[173]   Nutrition waived its Nutrition/Products Monetary Claims.[174]   The court preserved for trial the Dodart/Products Equitable Claims and the Products/Dodart Equitable Claims arising out of the Products/Dodart Infringement Counts.[175]

As between Mr. Dodart and Products, remaining to be resolved at trial and now before the court are: (1) the Dodart/Products Equitable Claims and (2) the Products/Dodart Equitable Claims arising out of the Products/Dodart Infringement Claims.   As between Nutrition and Products, remaining to be resolved at trial and now before the court are: (1) the Nutrition/Products Equitable Claims; and (2) the Products/Nutrition Claims including the Products/Nutrition Monetary Claims and the Products/Nutrition Equitable Claims.[176]   The court first considers the Dodart/Products and Products/Dodart Claims.   The court then considers the Products/Nutrition and Nutrition/Products Claims.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based upon the above described evidence, the court finds and concludes as follows:

## I.   Mr. Dodart has Standing to Assert his Equitable Claims.

Mr. Dodart seeks a declaratory judgment that he owned the trademark "Young Again" before he assigned it to Nutrition and that he did not infringe any rights Products has in the mark. He also seeks related injunctive relief.   Products contends that the court need not address Mr. Dodart's equitable claims.

---

[173]Pretrial Order at 3-4.

[174]Pretrial Order at 4.

[175]Pretrial Order at 3-6.

[176]Pretrial Order at 4-5.

Products first contends that assuming Mr. Dodart's assignment of his monetary claims and registered mark to Nutrition were valid, then he has no standing to assert these equitable claims.  Standing is analyzed at the time an action is filed.[177]  The three elements of standing are (1) an injury in fact; (2) causation; and (3) redressability.[178]

In his Complaint, Mr. Dodart, alleged, among other things, that Products infringed his trademark and committed unfair competition thereby injuring him.  Mr. Dodart sought declaratory, injunctive, and monetary relief, which a favorable decision from this court could have addressed.  Therefore, Mr. Dodart had standing when he brought this action.

The more salient issue is whether the assignments have since mooted Mr. Dodart's claims.  "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."[179]  A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."[180]  "The crucial question is whether granting a present determination of the issues offered . . . will have some effect in the real world."[181]

On September 11, 2003, Mr. Dodart executed a litigation agreement whereby he assigned to Nutrition all monetary claims that he possesses in this action against Products.[182]  Mr. Dodart, however, did not assign his equitable claims in that agreement.

---

[177]*See Tandy v. Witchita*, 380 F.3d 1277, 1284 (10th Cir. 2004).

[178]*See Utah Animal Rights Coalition v. Salt Lake City Corp.,* 371 F.3d 1248, 1255 (10th Cir. 2004).

[179]*Id.* at 1256 (quotations and citations omitted).

[180]*Id.* (quotations and citations omitted).

[181]*Id.* (quotations and citations omitted).

[182]Ex. D-296.

On September 17, 2003, Mr. Dodart purportedly assigned all right, title, and interest to the trademark "Young Again" and the registration to Nutrition.[183]  Because an assignee steps into the shoes of its assignor and Mr. Dodart assigned the registration to Nutrition, the assignment would seem to moot Mr. Dodart's claims for equitable relief.  In his Complaint, however, Mr. Dodart seeks not only a declaration that he owned the "Young Again" trademark, but also a declaration that his past-use of the mark in connection with the Dodart Product, or in connection with any other supplements, did not infringe or otherwise violate Products' rights.  As Products maintains that Mr. Dodart did infringe its trademark, the court concludes that there is an actual case or controversy between Mr. Dodart and Products.  The court therefore concludes that Mr. Dodart's claims for equitable relief are not moot.

## II.   Because the Assignment was Valid, Mr. Dodart Did Not Abandon his Rights.

Products next contends that Mr. Dodart abandoned any rights he had in the registered mark by not assigning the goodwill of the business in which the mark is used along with the mark.  The Lanham Act provides:

> A registered mark or a mark for which an application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark.[184]

A valid assignment of a trademark requires the transfer of the goodwill associated with the mark.[185]  The purpose for requiring transfer of goodwill along with the transfer of the trade or service mark is to ensure that consumers receive accurate information about the product or

---

[183]Ex. P-55; D-297.

[184]15 U.S.C. § 1060.

[185]*See, e.g., Vittoria N. Amer., LLC v. Euro-Asia Imports, Inc.,* 278 F.3d 1076, 1082 (10th Cir. 2001).

service associated with the mark.[186]  The litigation agreement states that the "Young Again" trademark is being assigned "together with the goodwill of the business symbolized by the Mark," however, "Dodart/LSPI is not transferring, selling or assigning any rights in the Dodart Product to Nutrition, and that the Young Again® trademark assignment may be deemed invalid on that basis . . . ."[187]  On March 4, 2004, however, Mr. Dodart signed a Product Distribution Agreement transferring Mr. Dodart's and LSPI's rights in the Dodart Product to Nutrition.[188] The reason for the roughly five-and-one-half month gap between the Trademark Assignment Agreement and the Product Distribution Agreement is that Mr. Dodart was in negotiations with a third party and it was not settled if Nutrition would be obtaining the Dodart Product from Mr. Dodart, LSPI or a third party (or potentially even developing Nutrition's own product to sell under the registered trademark).[189]  Additionally, Nutrition purchased Mr. Dodart's remaining inventory of the Dodart Product[190] and since at least 2004, Nutrition has sold the Dodart Product on "youngagain.com."[191]

Products contends that the fact that Mr. Dodart or LSPI has provided the product to Nutrition by way of subsequent agreement for resale does not evidence the transfer of goodwill. A transfer need not be simultaneous with the assignment, however, as long as the recipient continues to produce goods or perform services of the same quality and nature associated with

---

[186]*See id.*

[187]Ex. D-296.

[188]Ex. P-56.

[189]Trial Tr at 387, 390.

[190]Trial Tr. at 686-87.

[191]Trial Tr. at 68.

the mark such that consumers would not be deceived or harmed.[192] Moreover, the court is satisfied that the Product Distribution Agreement transferred the goodwill associated with the mark.  The court therefore concludes that Mr. Dodart did not abandon the mark.

Because Mr. Dodart's claim for equitable relief is not moot and Mr. Dodart did not abandon the mark via an invalid assignment, the court proceeds in the next section to consider whether Mr. Dodart's ownership of the registered mark trumps Products' use of the mark and whether he infringed Products' rights.

### III.    Mr. Dodart's Use Infringed Products' Rights in "Young Again."

Products contends that although Mr. Dodart registered the "Young Again" mark, it has the exclusive right to use that mark and Mr. Dodart's use constituted false designation of origin under the Lanham Act and unfair competition under Maryland and Utah law.  Mr. Dodart responds that naked licensing bars Products' claims.

### A.    Exclusive Right to Use "Young Again"

Trademark law protects owners in their exclusive use of their marks when use by another is likely to cause confusion.[193]  Under the Lanham Act, registration is

> prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein.[194]

---

[192] *See Vittoria N. Amer., LLC,* 278 F.3d at 1083.

[193] *See Lucent Info. Mgm't, Inc., v. Lucent Techs., Inc.,* 186 F.3d 311, 315 (3rd Cir.1999).

[194] 15 U.S.C. § 1115.

In this case, Mr. Dodart's registration is prima facie evidence that he – not Products – owned the mark "Young Again" and had the exclusive right to use the same (until of course he assigned the mark).  Registration, however, does not wipe out prior non-registered common law usage rights of others.[195]

Products contends that its first use establishes its ownership of the mark trumps Mr. Dodart's use and registration.  Products first used the mark on dietary/nutritional supplements in 1993, five years before Mr. Dodart's claimed first use.  Products has continuously sold supplements under the "Young Again" mark nationwide through a variety of channels, including cable television, radio, print media, direct mail, direct sales, credit card syndication, telemarketing, catalogue, retail and wholesale and the Internet.  Accordingly, the court would conclude that at the very least Products has established the concurrent right to use the mark nationwide.  As discussed below, however, because Products can also show likelihood of confusion, Products has the exclusive right to use the mark.

B.      *False Designation of Origin*

The Lanham Act protects against "false designations of origin."  In relevant part, the Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>
> (A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person,

---

[195]*See Lucent Info. Mgm't, Inc.,* 186 F.3d at 315 (citing 15 U.S.C. 1057(c)); *2 McCarthy on Trademarks and Unfair Competition*, § 16:18.1 (4th ed. 2006); *see also U.S. Search, LLC v. U.S.Search.com, Inc.*, 300 F.3d 517, 522 (10th Cir. 2002) (noting that Lanham Act's prohibition of the use of false designations of origin protects against infringement even if a mark has not been registered).

or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person

. . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.[196]

This section protects against trademark infringement even if a mark has not been federally registered.[197]  To prevail on its false designation of origin claim, Products must show that the mark is protectable and that Mr. Dodart's use of the mark was likely to confuse consumers as to the source, origin, sponsorship or affiliation of their goods or services.[198]  The court considers these two issues in turn.

### 1.    Protectability

In general, protectability can be measured on a five-part spectrum.[199]  The strongest marks are fanciful or arbitrary, which bear no relationship to the products with which they are affiliated.[200]  The next strongest marks are suggestive, which suggest some characteristic of products with which they are affiliated, requiring the consumer to use imagination and perception to determine the product's nature.[201]  The next strongest marks are descriptive, which immediately convey something about the ingredients, quality, color, odor, function, or dimensions of the goods.[202]  Descriptive marks are protectable only upon a showing of secondary

---

[196] 15 U.S.C. § 1125(a)(1).

[197] *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004).

[198] *See* 15 U.S.C. § 1125(a); *Donchez*, 392 F.3d at 1215.

[199] *See id.* at 1216.

[200] *See Sally Beauty Co.,* 304 F.3d at 974.

[201] *See id.*

[202] *See id.*

meaning.[203]  The final category of marks are generic marks, which refer to a general class of goods.[204]  Generic marks are not protectable.[205]  In short, protectability requires a showing that the mark is distinctive inherently (arbitrary, fanciful, or suggestive) or through acquisition of secondary meaning.[206]

Products has used the "Young Again" mark to brand several products, including its weight-loss products Fat Absorb and Thin Again.  The mark "Young Again," however, does not bear a relationship to these weight loss products.  Thus, the mark is arbitrary with regard to these products.  Other products such as NoPain (to treat arthritis), DHEA (to enhance the immune system), Pregnenolone (to enhance memory), and Retinol-A (to reduce wrinkles) relate to the slowing or reversing of the aging process.  With imagination, the "Young Again" mark is at least suggestive as to these products.

Because the court concludes that "Young Again" is at least suggestive with respect to Products' supplements, the court need not determine that the mark has acquired secondary meaning with regard to the false designation of origin claim.  Moreover, there is no evidence that "Young Again" is generically used by others.[207]  The court therefore concludes that the mark is protectable.

2.        Likelihood of Confusion

---

[203] *See id.*

[204] *See id.*

[205] *See id.*

[206] *See id.*

[207] *Cf. Universal Money Centers*, *Inc. v. American Tel. & Tel. Co.,* 22 F.3d 1527, 1533 (10th Cir. 1994) ("A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties.").

The court is also satisfied that Mr. Dodart's use of the mark was likely to confuse consumers.  In determining whether use of a mark is likely to cause confusion, the Tenth Circuit applies the following factors: (1) the degree of similarlity between the marks; (2) the strength or weakness of the mark; (3) the relation in use and the manner of marketing between the good or services marketed by the competing companies; (4) the degree of care likely to be exercised by purchasers; (5) evidence of actual confusion; and (6) the intent of the alleged infringer in adopting its mark.[208]

Products contends, however, that the court need not consider these factors because likelihood of confusion is established by averments in Mr. Dodart's complaint.  While that might be the general rule where a fact is alleged by one party in a complaint and conceded by the other in the answer,[209] in this case, Products itself denied the likelihood of confusion in its answers.  Moreover, while Mr. Dodart averred that Products' use of "Young Again" might confuse consumers as to the source of the Dodart Product, Mr. Dodart did not aver that *his* use of "Young Again" would confuse consumers as to the source of Products' supplements.  Accordingly, the court proceeds to consider the relevant factors.

a.      Similarity of the Marks

The degree of similarity between marks rests on sight, sound, and meaning.[210]

---

[208] *See King of the Mountain Sports, Inc., v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999).

[209] *See Hicks v. United States*, 486 F.2d 325, 329 (10th Cir. 1973).

[210] *See Sally Beauty Co.,* 304 F.3d at 972.

The similarities of the marks are to be given more weight than the differences.[211] Similarity of the marks must be examined as they occur in the marketplace.[212]  In this case, "Young Again" appears on the product labels with the same spelling and pronunciation, but with slight differences in font size and style.  On the Dodart product, "Young Again" is the name of a product rather than a brand mark.  Nonetheless, Mr. Dodart concedes that this factor leans in Products' favor and the court agrees.

b.      Strength of the Mark

 Because the court has concluded that "Young Again" is at least suggestive with respect to Products' supplements, the court need not determine that the mark has acquired secondary meaning in regard to the false designation of origin claim.  Accordingly, the court concludes that this factor favors Products.

c.      Similarity of Products and Manner of Marketing

In the Tenth Circuit, products need not directly compete to be subject to trademark infringement.[213]  The prodcuts may fall within the same descriptive class.[214]  Products contends that the Dodart Product is in the same descriptive class – nutritional supplements and vitamins – as its supplements.  Mr. Dodart contends, however, that the Dodart Product is an hGH secretagogue, and Products never sold an hGH supplement.  The court agrees with Products.  Mr. Dodart's attempt to distinguish the Dodart Product is too technical.

Products' supplements have been marketed over the Internet (among other channels) – initially pursuant to its agreement with Nutrition via "youngagain.com."  Before late 2003 or

---

[211]*See id.*

[212]*See King of the Mountain Sports, Inc.,* 185 F.3d at 1090.

[213]*See Team Tires Plus, Ltd. v. Team Tires Plus, Inc.*, 394 F.3d 831, 833 (10th Cir. 2005).

[214]*See id.*

early 2004, when Products began also marketing the Dodart Product to consumers over "getyoungagain.com" and "youngagainproducts.com," Mr. Dodart sold the product over the Internet, although primarily via a multi-level marketing network.  The court agrees that the Dodart Product was marketed through similar marketing channels.  Accordingly, the court concludes that this factor weighs in favor of Products.

> d.      Degree of Care Exercised by Consumers

A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusion.[215]  Consumers typically exercise little care in the selection of inexpensive items that may be purchased on impulse.[216]  Products presented evidence that most of Nutrition's products range in price from primarily from $3.75 to $39.95.[217]  This was the only evidence Products presented as to this factor.  Mr. Dodart, however, presented evidence that the Dodart Product sells for over $100.00 an ounce.[218]  Accordingly, the court finds that this factor weighs in favor of Mr. Dodart.

> e.      Actual Confusion

Products offered evidence that a law firm was confused as to whether to direct a letter regarding false statements regarding its client's products to LSPI or Nutrition's management and whether Mr. Mason was a member of that management.  Products offered no evidence of actual confusion between the Dodart Product and Products or its products.  Although evidence of actual

---

[215]*See Sally Beauty Co.*, 304 F.3d at 976.

[216]*See id.*

[217]Exs. D-97, 237.

[218]Trial Tr. at 418; Ex. P-59.

confusion is not necessary to prevail on a trademark infringement claim,[219] this factor weighs in favor of Mr. Dodart.

f.      Intent to Copy

Products contends that Mr. Dodart intended to copy the trademark "Young Again."  Mr. Dodart, however, selected the name "Young Again" out of numerous names being "kicked around" because he "thought it was catchy" and because the rest of his staff liked it.  Mr. Dodart speculated that he may have been stimulated to choose the name by a book written by a Dr. Ronald Klatz titled "Grow Young Again with hGH."[220]  At the time Mr. Dodart selected the name "Young Again" for the Dodart Product, Mr. Dodart had never heard of Products or any of Products' supplements.[221]

Products contends that based upon interactions with the PTO, Mr. Dodart should have investigated whether Products had rights in the mark.  Even if Mr. Dodart had such a duty, the August 18, 1998 trademark search performed by Mr. Dodart's trademark counsel revealed only a pending application for the mark Young Again Plus by Products, then a Maryland proprietorship, for "Manufacture / Distribute Natural Health and Beauty Aids" in international class 35 ("Advertising and Business Services").[222]  On September 18, 1998, the PTO advised Mr. Mason that "[t]he wording in the identification of goods is too broad because it could include items and/or services classified in other classes" including class 5 (vitamins and nutritional supplements).  However, the PTO further advised Mr. Mason his application was "currently classified in international Class 35 for distributorship services" and that the application would be

---

[219]*See Sally Beauty Co.*, 304 F.3d at 974.

[220]Trial Tr. at 384-86.

[221]Trial Tr. at 385.

[222]Ex. P- 40.

deemed abandoned if Mr. Mason did not respond to the PTO's letter within six months.[223]
Although the Dodart Trademark Application was suspended May 17, 1999, pending disposition
of Products' Young Again Plus Trademark Application,[224] Products abandoned its Young Again
Plus Trademark Application on June 11, 1999.[225]

     The Dodart Trademark Application was published for opposition on May 23, 2000.[226]
On June 19, 2000, Products applied for registration of its "Young Again" trademark.  Products,
however, did not oppose the Dodart Trademark Application.[227]  Mr. Dodart finalized his
application for registration of the "Young Again" mark on November 22, 2000, declaring,
through his counsel, that he believed himself to be the owner of the trademark.[228]  On May 14,
2001, the PTO suspended Products' Young Again Trademark Application due to the pending
Dodart Trademark Application.  On August 14, 2001, the PTO registered Mr. Dodart's Young
Again Trademark on the Principal Register for vitamins and nutritional supplements.[229]  Given
the circumstances above, the court cannot say that Mr. Dodart should have investigated further
or that these interactions establish that Mr. Dodart intended to copy Products' mark.

     Products also contends that its counsel sent a cease and desist letter to LSPI, dated June
27, 2000.  Mr. Dodart's counsel responded in a letter dated July 5, 2000.[230]  Additionally,

---

[223]Ex. P- 39; Trial Tr. at 330-31.

[224]Ex. P- 42.

[225]Ex. P- 43.

[226]Ex. P- 41,

[227]Trial Tr. at 332; Ex. P- 44.

[228]Ex. D-8.

[229]Ex. P.-57.

[230]Ex. D-6.

Products contends that Nutrition was aware through counsel that Products owned trademarks for particular products names.  However, under the circumstances, the court is not satisfied that this knowledge shows that Mr. Dodart intended to benefit from Products' goodwill or otherwise infringe Products' mark.  Accordingly, this factor weighs in favor of Mr. Dodart.

After considering the above factors, the court concludes that a likelihood of confusion existed as to Mr. Dodart's use of "Young Again."  Because of Products' firs use of the mark and the likelihood of confusion, the court concludes that Products has the exclusive right to use the mark and is entitled to prevail on the false designation of origin claim unless Mr. Dodart can establish that naked licensing bars the claim.

3.    *Mr. Dodart's Naked Licensing Defense*

Naked licensing is established when a licensor allows a licensee to use the licensor's trademark on any quality or type of product the licensee chooses.[231]  Naked licensing is treated as an abandonment of the trademark, which triggers loss of trademark rights against the world.[232]  The ultimate issue is whether the control exercised by the licensor was sufficient under the circumstances to satisfy the public's expectation of quality assurance.[233]  The party asserting the defense bears a stringent burden of proof.[234]

Mr. Dodart concedes that Products presented evidence that Nutrition would forward customer questions to Products and Products would assist Nutrition with labels, manufacturers, and ingredients.  Yet, Dodart contends Products conceded that it has no control over Nutrition. Additionally, in this case there is no written agreement providing that Products could control

---

[231]*See Stanfield v. Osborne Indus.,* 52 F.3d 867, 871 (10th Cir. 1995).

[232]*See Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000).

[233]*See id.*

[234]*See id.; Stanfield,* 52 F.3d at 871.

Nutrition.  Moreover, by 2003, Nutrition was selling over 200 supplements not manufactured by Products, including products under the name Young Again Nutrition to which Mr. Mason objected.

The evidence shows, however, that Products exercised control.  When Mr. Ortega created the website "youngagain.com," all the products, content, descriptions, and advertising information came from Mr. Mason.[235]  All the initial products were labeled with the "Young Again" mark at the top center.[236]  Mr. Mason approved the three products from other vendors.[237] Products' supplements and those three other products were the only products Nutrition offered until 1999.[238]  Moreover, Mr. Ortega substituted Fat Sponge for Fat Absorb and changed the name of the business from Young Again Products to Young Again Nutrition based upon Mr. Mason's demands.

In 1998, Mr. Ortega sent Mr. Mason a letter indicating that he and his wife owned the URL and controlled the business.  As almost all of the supplements on "youngagain.com" were from Products, it then chose to cease all sales of products to Nutrition.[239]  Moreover, Mr. Acord, who was in prison, asked Products not to take down the website, and promised to take over the website when he was released in a matter of months.[240]

---

[235]Trial Tr. at 276.

[236]Trial Tr. at 101-02.

[237]Trial Tr. at 45-46, 51, 115, 287-88, 459, 461.

[238]Exs. D-237; P-11.

[239]Trial Tr. at 197, 232-33.

[240]Trial Tr. at 219-20, 341-42.

When Mr. Acord was released, Mr.Ortega turned management of the website over to him.[241]  Shortly after his release, Mr. Acord wrote the Masons, "I need your guidance as I do not want to make any false steps or compromise our relationship, so I'm going to ask a lot of questions until I have the SOP [Standard Operating Procedure] understood.  Before putting anything on the page, I want you to read it over for accuracy and suitability."[242]  When Mr. Acord returned he began adding supplements, including supplements Products developed.[243]  In 1999, Products decided to discontinue offering Retinol-A and No-Pain [244] and "gave" the same to Nutrition, providing detailed instructions for the production of Retinol-A, including the contract packager, necessary ingredients and amounts, order quantities and jar sizes, and contact information.[245]  In May 2000, Products was still providing instructions to Nutrition with respect to Retinol-A[246]  Moreover, until early 2003, communications between Mr. Mason and Mr. Acord and Mr. Acord and manufacturers indicate that Mr. Mason providing labeling information and advertising,[247] formulas (including ingredients, strength, unit count, and costs),[248] suggestions,[249]

---

[241]Trial Tr. at 63.

[242]Ex. D-15.

[243]Trial Tr. at 658-59.

[244]Trial Tr. at 309.

[245]Ex. D-78, Trial Tr. 357-58.

[246]Ex. D-87.

[247]Trial Tr. at 498.

[248]Trial Tr. at 500-01; Ex. D-79.

[249]Ex. D-80.

pricing,[250] dosages,[251] and ingredients[252] for other products.  He also reviewed product lists and demanded removal of products from "youngagain.com."[253]  Mr. Acord openly acknowledged to a customer as late as May, 2003 that Mr. Mason is "watching over"at least one of the supplements.[254]  Nutrition's unequivocal refusal in 2003 to remove supplements from "youngagain.com" that Mr. Mason objected to, plus the fact that Nutrition owed Products $120,000, ultimately resulted in Products terminating its relationship with Nutrition.[255]  The court is satisfied that the above evidence shows control.  Based upon the foregoing, Mr. Dodart has not met his stringent burden to show (or even shown by the preponderance of the evidence) that Products engaged in naked licensing.  The court therefore concludes that Mr. Dodart committed false designation of origin under the Lanham Act.

C.     *Unfair Competition Claims*

Products asserts Maryland and Utah unfair competition claims against Mr. Dodart.  Products claims for monetary relief, however, were dismissed, leaving only Products' equitable claims against Mr. Dodart.  Because the court has concluded that Products has prevailed on the false designation of origin claim and the equitable relief Products seeks follows from that conclusion, the court does not address these unfair competition claims.

**III.    Nutrition's Use of "Young Again" Infringed Products' Rights in "Young Again."**

Products contends that its use of the "Young Again" mark trumps Nutrition's use and that

---

[250]Ex. D-85.

[251]Ex. D-89, 91.

[252]Trial Tr. at 507; Ex. D-101.

[253]Ex. D-118.

[254]Ex. D-41, 123.

[255]Trial Tr. at 463-65.

Nutrition's use constitutes false designation of origin under the Lanham Act, dilution under the Lanham Act, unfair competition under the common law of Maryland and Utah, and intentional interference with economic relations.  Products also asserted deceptive trade practices and state dilution claims.  These claims were not mentioned at trial or sufficiently briefed in post-trial briefs.  The court therefore does not consider these claims.

Nutrition asserts laches, acquiescence, and the first sale doctrine bar Nutrition's claims. The court first considers Products' claims, then considers Nutrition's defenses.

A.      *Exclusive Right to Use "Young Again"*

Products first used the trademark "Young Again" on supplements in 1993, three years before Nutrition began selling Products' supplements on "youngagain.com" *with Products' permission*.  Mr. Ortega conceded at trial that he had nothing to do with the creation of the brand "Young Again" and that all the initial products on the website came labeled from Products with "Young Again" at the top center of the label.  In late 2002 or early 2003, Nutrition sold dietary supplements provided by Products or other manufacturers with labels stating that "Young Again" was a trademark of Products.  As late as 2004, Nutrition published an article noting Products' first use and ownership of the trademark "Young Again."  Mr. Acord also supported Products' efforts to enforce its rights against Mr. Dodart.  In any event, the evidence shows that Products continuously used the mark and sought to enforce its rights not only against Mr. Dodart but also against others.  Nutrition, however, never sought to enforce any rights in the mark against others.

Nutrition contends that Products does not have exclusive trademark rights in "Young Again," the parties' relationship was a joint venture, and it developed independent legal rights in its business name and URL.  In particular, Nutrition claims that Mr. Acord and Mr. Ortega

believed that they each had a one-third interest in Products and that is why they adopted "youngagain.com" as a URL.

Neither Mr. Ortega nor Mr. Acord are parties to this case. Whether Mr. Ortega and Mr. Acord had an interest in Products (or whether Mr. Mason breached an agreement he had with Mr. Ortega and Mr. Acord) technically has no bearing on whether Nutrition has any ownership interest in the trademark "Young Again." Moreover, the court is convinced that Mr. Ortega and Mr. Acord have no ownership interest in Products. This court bases this determination on credible testimony by Mr. Mason that he returned the money Mr. Ortega invested for an interest, Mr. Ortega's failure to mention that he believed that he had a one-third interest in his 1998 letter to Mr. Mason, and Mr. Acord's acknowledgment that the Texas corporation mentioned in his 1993 memorandum to Mr. Mason was never formed. Moreover, since that time, the parties have proceeded as though no such interests exist. In short, while the parties may have discussed in 1993 giving one-third interests in Products to Mr. Acord and to Mr. Ortega, the deal never went through.

Nutrition also contends that Mr. Ortega's January 14, 1998, letter shows that it had an interest. In the letter, Mr. Ortega states that *he* owns the URL "youngagain.com" and that he would authorize Mr. Mason to register a competing domain name. Nutrition notes that Mr. Mason did not respond to the letter and the only justification Mr. Mason gave for not responding was that he did not know if he could stop Nutrition from using the URL. Products, however, cut-off supply of products to Nutrition. At that time, Products supplied all but three products sold on "youngagain.com." Products did not take any additional action because Mr. Acord was going to be released from prison and promised to take over the website. Thus, Products did not need to otherwise respond to the letter.

Nutrition also contends that it has exclusive rights via the Dodart registration.  However, the court has determined that Products' first use and likelihood of confusion (discussed below in regard to Nutrition's use) trumps that registration.  Accordingly, the court concludes that Products has exclusive rights in the "Young Again" mark against Nutrition.

        B.     *False Designation of Origin*

As discussed above, to prevail on its false designation of origin claim, Products must must show that its trademark is protectable, and that Nutrition's use of the mark was likely to confuse consumers as to the source, origin, sponsorship or affiliation of their goods/services.[256] The court has determined that the Products' mark is protectable.  Therefore at issue is likelihood of confusion.  Accordingly, the court proceeds to consider the factors the Tenth Circuit applies when determining whether likelihood of confusion exists.

        1.     Similarity of the Marks

The degree of similarity between marks rests on sight, sound, and meaning.[257]  The similarities of the marks are to be given more weight than the differences.[258]  Here, while some product labels have "Young Again Nutrients" at the top, most simply have "Young Again."  The mark "Young Again" appears on the top center of the labels with the same spelling and pronunciation, with slight variations in font type and size.  And with respect to all products but the Dodart Product (where "Young Again" is the name of a product) the mark serves a brand. Accordingly, the court finds that this factor weighs in favor of Products.

        2.     Strength of the Mark

---

[256]*See* 15 U.S.C. § 1125(a); *Donchez,* 392 F.3d at1220.

[257]*See Sally Beauty Co.*, 304 F.3d at 972.

[258]*See id.*

The court has determined that the mark is at least suggestive.  Therefore, this factor weighs in favor of Products.

3.      Similarly of Products and Manner of Marketing

Nutrition continues to sell Products' supplements, which account for 75% of Nutrition's sales.  These products are the same.  The other products sold are similar supplements.

Additionally, Nutrition sells its supplements on the Internet.  Beginning in 2003, Products began selling supplements on the Internet.  The court accordingly finds that this factor weighs in favor of Products.

Nutrition makes much of the fact that Products did not begin selling supplements on the Internet until 2003.  Nutrition therefore contends that Products thereby created confusion and should not be allowed to recover.  Products began selling products on its own Internet websites at the same time that its relationship began seriously deteriorating with Nutrition.  The court is satisfied that the destruction of the relationship necessitated that Products create its own websites.   Therefore, Nutrition cannot escape liability under the Lanham Act on this basis.

4.      Degree of Care Exercised by Consumers

Products presented evidence that most of Nutrition's products range in price from $3.75 to $39.95.[259]  Thus, Products argues that the products are inexpensive and consumers would likely purchase on a whim.  The court agrees, and therefore, this factor weighs slightly in favor of Products.

5.      Actual Confusion

Products offered e-mails from customers[260] in support of its position that they were actually confused as to the source of Nutrition's products as well as to the sponsorship of the

---

[259] Exs. D-97, 237.

[260] *See* Exs. D-313-27, 329-35, 437.

website "youngagain.com."  At trial, Nutrition objected to the e-mails as hearsay.  In supplemental post-trial briefing, Products contends that the e-mails are admissible under the state of mind,[261] business record,[262] and residual exceptions to the hearsay rule.[263]  Products also contends that Mr. Mason's testimony is admissible under the state of mind exception.

The court must first consider whether the statements offered in the e-mails are hearsay.  Direct statements from a customer that he or she was "confused" and the like might be hearsay.  But the court is satisfied that the important inquiries and statements in the e-mails are not hearsay.  Hearsay is a statement offered to prove the truth of the matter asserted.[264]  The inquiry as to whether a product is available from Products via "youngagain.com,"[265] the statement that a customer ordered a supplement (which other evidence shows is one of Nutrition's products) from Products and inquiry about the status of the supplement,[266] and inquiries as to whether "youngagain.com" is Product's website[267] are not offered for the truth of the matter asserted – i.e. that a customer actually ordered a product.  Rather, they are offered as statements of circumstantial evidence.  Such inquiries and statements are not hearsay and are therefore admissible.

Additionally, while recognizing the division of authority as to the admission of testimony about customer inquires to show confusion, the Tenth Circuit has recognized that a company

---

[261]*See* Fed. R. Evid. 830(3).

[262]*See* Fed. R. Evid. 803(6).

[263]*See* Fed. R. Evid. 807.

[264]Fed. R. Evid. 801(c).

[265]Ex. D-314.

[266]Ex. D-315, 321, 326.

[267]Ex. D-316, 317, 320, 332, 335.

official's testimony that associates had inquired about whether a junior brand mark was associated with a senior brand mark was admissible because it was offered to show the then existing state of mind of the associates under Rule 803(3) of the Federal Rules of Evidence.[268] Thus, at the very least, Mr. Mason's testimony as to customer inquiries is admissible for that limited purpose.

The Tenth Circuit, has noted, however, that the "'better view would seem to be that while [customer] enquiry evidence is admissible and relevant, standing alone with no other evidence it is insufficient proof of actual confusion'"[269] in trademark infringement cases.   The only evidence of customer confusion Products offered as to Nutrition was customer inquiry evidence and Mr. Mason's testimony regarding the same.   Accordingly, the court concludes that, standing alone, this evidence does not establish actual confusion.   The court therefore concludes that his factor weighs in favor of Nutrition, although only slightly.

    6.      Intent to Copy

Mr. Ortega and Mr. Accord both acknowledged that "Young Again" was Products' trademark.   Mr. Ortega further testified that Products permitted him to use the URL "youngagain.com" and that the Young Again Products name on the website was changed to Young Again Nutrition at Mr. Mason's request.   After Products demanded that Nutrition cease using the trademark "Young Again" and selling its supplements, Products continued to hold itself out as authorized to distribute "Young Again" supplements, continued to offer supplements labeled as "Young Again" products for sale on the website, and to trade on the goodwill of Products.

---

[268] *See Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 & n.4 (10th Cir. 1987).

[269] *Id.* (quoting 2 J. McCarthy, Trademarks & Unfair Competition § 23:2(b) at 54 (2d ed. 1984)).

Nutrition contends that it did not intentionally infringe because Mr. Acord and Mr. Ortega believed in good faith that they had an ownership interest in Products. Mr. Acord and Mr. Ortega, however, were aware at least by 1998, that Mr. Mason had rejected the one-third interest deal and therefore such belief in 2003 was unreasonable. Nutrition also contends that it did not intentionally infringe because it was merely exercising its rights under the assignment as the owner of the registered mark, which is presumed to be valid. Although Nutrition was aware that Products was asserting that it had the exclusive right to use the trademark "Young Again," that determination was not made until after trial. Accordingly, the court is satisfied that under the circumstances, Nutrition did not intend to infringe Products' mark. This factor, therefore, weighs slightly in Nutrition's favor.

Products argues that, in addition to the six factors above, based upon the fact that Nutrition was its distributor and licensee and that Nutrition continued to use Products trademark after termination of the distribution and license agreement, that a likelihood of confusion is established. There is conflicting evidence, however, as to whether Nutrition was Products' distributor. There is no evidence of any written distribution agreement and the terms of an oral agreement regarding their relationship is in dispute. At the very least, however, Nutrition was Products' vendor.

While, there was no written license agreement, the evidence is conflicting as to an oral license agreement. However, a license may be implied based on the parties' conduct. Such a license exists where there is permission to use a trademark coupled with control and may be terminated at will.[270] Based upon Mr. Ortega's testimony that Nutrition agreed to promote Products' supplements via "youngagain.com," Mr. Ortega's and Mr. Acord's testimony that

---

[270] *Coach House Rest., Inc. v. Coach & Six Rest., Inc.*, 934 F.2d 1551, 1563 (11th Cir.1991).

Products permitted Nutrition's use of the "Young Again" trademark and the Masons' testimony that Products had agreed to develop a website to promote Products' supplements as well as supplements Products' approved, the court concludes that permissive use is established. Additionally, as discussed above in regard to Mr. Dodart's naked licensing defense, the court concludes that Products exercised sufficient control.

Nutrition notes that in February 2003, after Mr. Dodart filed this lawsuit, Mr. Mason, for the first time, instructed its manufacturer to place the notation "'Young Again' is a trademark of [Products]" on its labels.  However, Nutrition never objected to the labels and sold products to consumers so labeled.

Nutrition also notes that in Products' Memorandum in Support of its Motion to Dismiss for Lack of Personal Jurisdiction and in 2002 deposition testimony the Masons deny that Products and Nutrition have a licensor/licensee relationship.  The court agrees with Products, however, that there is a difference between control over where a licensee sells product versus control over the products themselves.  In this case, actions speak louder than words.  There is sufficient evidence of control to support an implied license.

Nutrition also contends that on March 3, 2003, Mr. Mason sent Mr. Acord an e-mail stating that "they" had to give Nutrition a license.  While this indicates that Mr. Acord recognized the need for a license, that does not preclude the finding that the parties entered into an implied license by their conduct.  In sum, the court concludes that at the very least the parties had an implied license.

In this case, the most salient factors are the similarity of the mark, products, and marketing channels.  After considering all the relevant factors, the court concludes that Nutrition's use of the "Young Again" trademark is likely to cause confusion.  Products,

therefore, prevails on its false designation of origin claim against Nutrition.

      *C.*     *Dilution*

      To show Nutrition's use of "Young Again" diluted the mark, Products must show that "Young Again" is a famous mark, that Nutrition made use of the mark in commerce, that Nutrition adopted the mark after Product's mark became famous, and Nutrition's use dilutes the quality of the mark.  At issue in this case is whether "Young Again" is a famous mark and whether Nutrition's use dilutes the quality of the mark.

      The following factors are relevant to determining whether a mark is famous:

| | |
|---|---|
| (A) | the degree of inherent or acquired distinctiveness of the mark; |
| (B) | the duration and extent of use of the mark in connection with the goods or services with which the mark is used; |
| (C) | the duration and extent of advertising and publicity of the mark; |
| (D) | the geographical extent of the trading area in which the mark is used; |
| (E) | the channels of trade for the goods or services with which the mark is used; |
| (F) | the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; |
| (G) | the nature and extent of use of the same or similar marks by third parties; and |
| (H) | whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.[271] |

      The court has determined that the "Young Again" trademark is inherently distinctive. Products first used the mark in connection with nutritional supplements in 1993.  At least by early 1997, Products was selling supplements under the mark nationwide.  Products has sold its supplements, retail and wholesale, bearing the "Young Again" mark through network and cable television, radio, print media, direct mail solicitation, direct sales, credit card syndication, telemarketing, catalogue sales, on-line (Internet) sales, doctors, clinics, and physicians.[272]  The parties have stipulated that the "Young Again" mark has acquired recognition in the market

---

[271]15 U.S.C. § 1125(c)(1).

[272]Pretrial Order, Undisputed Fact F.

place and goodwill among consumers.[273]  No evidence was presented that third parties (excluding Mr. Dodart) have used the mark.  As to Products, however, the mark is not registered.  All factors except for registration support a determination that the "Young Again" mark is famous.  Accordingly, the court concludes that "Young Again" is famous.

Dilution means the lessening capacity of a famous mark to identify and distinguish goods and services, regardless of the presence or absence of competition or likelihood of confusion.[274] To prevail, Products must show actual dilution.[275]  Actual dilution may be proved through circumstantial evidence.[276]  Where the junior and senior marks are identical, use of the junior mark creates a presumption of dilution.[277]  Except in the case of products branded with "Young Again Nutrients," the marks are identical.  Actual dilution is therefore presumed in this case.

The court determines that "Young Again" is famous, Nutrition made use of the "Young Again" mark in commerce, Nutrition adopted the mark as its own after it became famous, and Nutrition's use dilutes the quality of the mark.  Accordingly, the court concludes that Products is entitled to trial on damages on its dilution claim, which damages will be determined at a later proceeding.

D.     *Common Law Unfair Competition Claims*

---

[273]Pretrial Order, Undisputed Fact O.

[274]*See* 15 U.S.C. § 1127.

[275]*See Moseley v. V. Secret Catalogue, Inc.,* 537 U.S. 418, 433 (2003).

[276]*See id.*

[277]*See id.; Savin Corp. v. Savin Group,* 391 F.3d 439, 452-53 (2d Cir. 2004), *cert. denied,* 126 S. Ct. 116 (2005).

As a threshold matter, neither Nutrition nor Products have bothered to analyze choice of law issues in the context of the present case.  But the record indicates that after Products terminated permission to use the mark "Young Again," Nutrition sold products via the Internet in Utah.[278]  Additionally, Products is a Maryland corporation.  Thus, the court is satisfied that Utah and Maryland law should be analyzed.

In Utah, a party commits the tort of unfair competition by palming off or misappropriating goodwill.[279]  Both involve situations where a company attempts to profit from the reputation of its competitor by selling one of its own products as that of its competitor or misappropriating a trademark belonging to its competitor.[280]  The likelihood of confusion test applicable to Products' false designation of origin claim is applicable to its common law unfair competition claim.[281]

Under Maryland law (which is similar to Utah's), unfair competition consists of passing off or attempting to pass off on the public the goods or business of one person as that of another in conduct of trade or business.[282]  The acts complained of "must be of such a nature as to mislead and deceive the public."[283]  Thus, to prevail a party must show a likelihood of confusion as to the product's origin.[284]

---

[278]See Exs. D-216-17.

[279]*Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000) (citing *Allen's Prods. v. Glover*, 414 P.2d 93, 95 (1966)).

[280]*See id.*

[281]*See Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (Utah 1984).

[282]*See Edmondson Village Theatre v. Einbinder*, 116 A.2d 377, 379-80 (Md. 1955).

[283]*See id.* at 380.

[284]*See Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594,597 (4th Cir. 1992).

As discussed above, Nutrition misappropriated Products' trademark and there is a likelihood of confusion. The court is therefore satisfied that Nutrition's actions constitute unfair competition under both Utah and Maryland law.

E.    *Intentional Interference Claim*

Under Maryland law, the elements of intentional interference with economic relations are: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in its lawful business; (3) done with a purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and actual damage and loss resulting.[285]

Under Utah law, the elements of intentional interference with economic relations include that: (1) the defendant intentionally interfered with the plaintiff's existing or potential economic relations; (2) for an improper purpose or by improper means; and (3) thereby caused economic injury to the plaintiff.[286] A party is subject to liability for an intentional interference with present contractual relations if he intentionally and improperly causes one of the parties to not perform a contract.[287] In this case, there is no showing that Nutrition caused any of Products' customers to not perform a contract. Further there is insufficient evidence that Nutrition intentionally interfered with any of Products' prospective economic relations to cause or thereby caused economic injury to Products. Rather, this is a garden variety trademark dispute. Accordingly, this claim fails.

F.    *Laches and Acquiescence Defenses*

---

[285] *See Carter v. Aramark Sports & Enter. Servs., Inc.*, 835 A.2d 262, 279-80 (Md. 2003).

[286] *See Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982).

[287] *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991).

Nutrition contends that Products' claims are barred by laches and acquiescence.  Products

contends that Nutrition cannot assert laches or acquiescence as a defense because of licensee

estoppel.  The court agrees that Products would be estopped as a licensee from challenging the

validity trademark by a naked license defense.[288]  Nutrition, however, is not challenging the

validity of the trademark.  Rather, Nutrition challenges Products' acquiescence or laches in

regard to its use of the mark.

  To establish a laches defense, Nutrition must demonstrate that Products unreasonably

delayed in filing suit to enforce its trademark rights against Nutrition and as a result of the delay

Nutrition was prejudiced.[289]  To show acquiescence, Nutrition must also demonstrate that

Products' conduct constituted an assurance, express or implied, that Products would not assert its

rights against Nutrition.[290]  Laches or acquiescence may bar claims for injunctive relief or

damages where the alleged infringer has invested substantial labor and capital building a

trademark's goodwill.[291]

Nutrition contends that based upon Mr. Ortega's January 14, 1998 letter, Products should

have been aware that Mr. Ortega believed he owned the URL "youngagain.com" and the name

"Young Again Nutrition," and that he alone controlled the business and would consider

authorizing Mr. Mason to register a competing domain name.  Nutrition makes much of the fact

that "youngagain.com" is a well-established domain name and that if this positioning is lost, it

will have to start over in a tougher Internet arena than existed in 1998.  Nutrition maintains that

Products sat back while Nutrition spent millions of dollars building its business and recognition

---

[288]*See Creative Gifts, Inc.,* 235 F.3d at 547-48 (10th Cir. 2000).

[289]*See id.*

[290]*See id.*

[291]*See NAACP v. NAACP Legal Defense Fund*, 753 F.2d 131, 137-38 (D. D.C. 1985).

for "youngagain.com" in the marketplace while paying Products for its products. Nutrition contends that Products should have asserted its rights in 1998, not in 2003, and that its failure to do so was unreasonable delay or active consent.

However, after receiving Mr. Ortega's letter, Products chose to cut-off the supply of products to Nutrition. At that time, Products supplied all but three products sold on "youngagain.com." Products did not take any additional action because Mr. Acord was going to be leaving prison and promised to take over the website. Therefore, Products reasonably believed that no further action was necessary. In short, there was no likelihood of confusion or infringement in 1998, and no need for Products to take legal action at that time.

When Mr. Acord took over the website in 1999, he asked Mr. Mason review to anything he put on the website for accuracy and suitability. While Mr. Mason objected to products added between 2000 and 2002, the parties' relationship was generally good until late 2002 or early 2003, when Products unequivocally refused to remove products that Mr. Mason determined where unacceptable. Mr. Dodart brought this action in 2003 and Nutrition was well aware that Products was defending its mark when it sought to join this action later that same year. Nutrition has not established that Products' unreasonably delayed enforcing its rights in the trademark "Young Again" against Nutrition.

Nutrition also contends that it will be prejudiced if Products prevails in this case. Nutrition claims that it spent millions of dollars promoting "youngagain.com" and selling products under its trade name Young Again Nutrition for over 9 years. These actions were encouraged by Products. Nutrition also claims it cannot run its business without the URL "youngagain.com."

However, even if Nutrition was prejudiced, as discussed above, it has not shown unreasonable delay. Products points out that although Nutrition may have promoted

"youngagain.com," Nutrition also greatly profited from such promotion.  Nutrition also knew that Products was aggressively defending the "Young Again" mark against Mr. Dodart. Products informed Nutrition of the cancellation proceeding in June 2002, and requested that it be notified immediately if Nutrition found anyone else using the name Young Again.[292]

Because Nutrition has not shown unreasonable delay, its laches and acquiescence defenses fail.

     G.    *First Sale Doctrine*

Nutrition also contends that the first sale doctrine bars Products' claims.  In general, the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product.[293]  Resale by the first purchaser of the genuine, original product under the producer's trademark is neither trademark infringement nor unfair competition.[294]  A purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark does not violate the Lanham Act.[295]  The first sale doctrine, however, does not protect resellers who use other entities' trademarks to give the impression that they are favored or authorized dealers for a product when in fact they are not.[296]

In this case, after Products terminated the parties' relationship, Nutrition continued to use the "Young Again" brand on other supplier's products, used the URL "youngagain.com," and the name "Young Again" on the website.  This would give the impression that Nutrition was an

--------

[292]Ex. D-195.

[293]*See Australian Gold, Inc., v. Hatfield,* 436 F.3d 1228, 1240-41 (10th Cir. 2006).

[294]*See id.* at 1241.

[295]*See id.*

[296]*See id.*

authorized Young Again distributor even though it was not.  Accordingly, the first sale doctrine does not bar Products' claims.

**V.      Nutrition's Ownership Claims Are Without Merit**

Nutrition claims that it has the exclusive right to use the mark by virtue of use and by assignment of Mr. Dodart's registered mark.  As discussed, however, these claims are without merit.

**VI.     Products is Entitled to Injunctive Relief, Cancellation of the Dodart Registration, and Damages**

*A.      Injunctive Relief*

Nutrition contends that Products is not entitled to an injunction at all or, at most, a narrow injunction.  Products correctly notes, however, that Nutrition premises its arguments on the assumption that Products acquiesced in Nutrition's use.  The court has rejected that defense.

If acquiescence had been established, the court would have to find inevitable confusion.  In this case, because the mark and products are quite similar and sold are over similar channels (e.g. the Internet), the court is satisfied that inevitable confusion exists.

Nutrition also contends that a total injunction is permissible only if the junior user fails to demonstrate the availability of feasible and effective alternative means for redressing the senior user's revived claim and vindicating the public interest in eliminating marketplace confusion. Nutrition contends that since it sells only on the Internet, confusion can be prevented by a simple disclaimer on the front pages of the websites clearly indicating that the companies are not related.  In this case, Nutrition has not shown that a disclaimer would be sufficient to alleviate the likelihood of confusion.[297]   Rather, Nutrition makes conclusory allegations that the likelihood

---

[297]*See Australian Gold, Inc.,* 436 F.3d at 1240.

of confusion could be remedied by a simple disclaimer.[298]   The court is not persuaded that a

disclaimer would be sufficient given the circumstances.   The disclaimer would only be seen *after*

a customer entered the website.   Moreover, it is not clear that even a prominent disclaimer would

always be read.   Accordingly, the court concludes that injunctive relief is appropriate against

Nutrition (and Mr. Dodart).   In principle, that relief would include Product's exclusive right to

use the mark "Young Again" in connection with nutritional supplements and related products.

The injunction would also seem to properly prohibit Nutrition from using the URL

youngagain.com to market supplements.   These issues require careful consideration.   The court

therefore orders Products to submit a proposed order for declaratory and injunctive relief.   The

plaintiffs may file any objections in accord with the schedule ordered below.

>    B.    *Cancellation of the Dodart Registration*

Products seeks cancellation of the Dodart Registration.   The Lanham Act

provides  that "in any action involving a registered mark the court may determine the right to

registration, order the cancellation of registrations, in whole or in part . . ."[299]   To obtain

cancellation in this case, Products must show that it has priority and that registration of the mark

creates a likelihood of confusion.[300]

>    To establish priority, the petitioner must show proprietary rights in
>    the mark that produce a likelihood of confusion…. These
>    proprietary rights may arise from a prior registration, prior
>    trademark or service mark use, prior use as a trade name, prior use

---

[298]*See id.*

[299]15 U.S.C. § 1119.

[300]*See* 15 U.S.C. § 1052; *Herbko Intern., Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1161-
62 (Fed. Cir. 2002); 3 McCarthy on Trademarks and Unfair Competition § 20:53 (4th
ed. 2006).

analogous to trademark or service mark use, or any other use
sufficient to establish proprietary rights.[301]

As discussed above, Products established priority in use likely to cause confusion.
Accordingly, the court determines that cancellation of the Dodart registration is appropriate.
Products' counsel shall draft a proposed order to that effect in accord with the schedule below.

C.      *Nutrition's Profits and Attorney's Fees*

The court has bifurcated the trial and reserved a determination of damages.  Thus,
damages remain to be determined.

Products asks the court to determine at this point whether Nutrition's infringement was
wilful and exceptional entitling it to recover profits and attorney's fees.[302]  Under the Lanham
Act, Products is entitled to recover, subject to principles of equity, (1) Nutrition's profits, (2) any
damages its has sustained, and (3) the costs of the action.[303]

Absent a showing of actual damages, the Tenth Circuit requires a showing of
wilfulness.[304]  Thus, absent a showing of actual damages, a plaintiff must ordinarily show that
the defendant intended to appropriate the goodwill or reputation of the trademark holder.[305]
The court is satisfied that Nutrition did not wilfully appropriate the goodwill or reputation of
Products.  For all the reasons recounted above, this is a routine trademark dispute between two
companies, with reasonable arguments on both sides regarding rights to the mark, not an

---

[301] *Herbko Intern., Inc.,* 308 F.3d at 1162.

[302] *See* 15 U.S.C. § 1117(a); *Western Diversified Servs., Inc. v. Hyundai Motor Amer.,
Inc.*, 427 F.3d 1269, 1274 (10th Cir. 2005).

[303] *See* 15 U.S.C. § 1117(a)

[304] *See Western Diversified Servs., Inc.,* 427 F.3d at 1274.

[305] *See id.*

exceptional case in which an infringer wilfully intended to appropriate the good will of an established trademark holder.  Accordingly, absent a showing of actual damages, Products cannot recover profits.

Products also contends that it is entitled to recover attorney's fees. The Tenth Circuit has determined that an exceptional case justifying fees occurs when "a trademark infringement is malicious, fraudulent, deliberate or wilful."[306]  The court is satisfied that Nutrition's infringement was not malicious, fraudulent, wilful, or deliberate under the circumstances.

In short, at the trial on damages, the court will allow Products to prove actual damages, but in the absence of such proof, Products will not be awarded profits.  Additionally, the court will not award attorney's fees to Products under the Lanham Act.

Based upon the foregoing FINDINGS OF FACT AND CONCLUSIONS OF LAW the court hereby ORDERS:

1.      The parties shall appear before the court for a status conference on November 8, 2006, at 2:30 p.m.

2.      On or before October 13, 2006, Products' counsel shall file a proposed order of declaratory and injunctive relief and a proposed order of cancellation.  The plaintiffs shall file any objections on or before October 27, 2006.  Products shall file any reply on or before November 3, 2006.  The court will consider these matters at the status conference on November 8, 2006.

3.      The parties shall meet and confer before November 8, 2006 to try to arrive at a

---

[306]*United Phosphorus, Ltd. v. Midlan Dumigan, Inc.*, 205 F.3d 1219, 1232 (10th Cir. 2000) (concluding more than enough evidence of exceptional grounds existed where infringer deliberately relabeled inferior product with mark after repeated warnings to stop doing so and continued to infringe after agreeing to stop doing so in settlement agreement).

mutually agreeable schedule to bring this matter to final resolution before February 15, 2007.

4.      In accord with the court's previous order bifurcating liability and damages,

the court will determine damages at a bench trial that will be scheduled at the status conference

on November 8, 2006.

5.      The bench trial as to liability is hereby terminated.

SO ORDERED.

DATED this 29 day of September, 2006.

BY THE COURT:

_____

Paul G. Cassell
United States District Judge